**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                 :
DAVID ROUSSEAU, AS TREASURER     :
OF THE STATE OF NEW JERSEY,      :    CIVIL ACTION NO. 04-4368 (MLC)
et al.,                          :
                                 :         MEMORANDUM OPINION
        Plaintiffs,              :
                                 :
        v.                       :
                                 :
UNITED STATES DEPARTMENT         :
OF THE TREASURY, et al.,         :
                                 :
        Defendants.              :
                                 :
```

**COOPER, District Judge**

Defendants, United States Department of the Treasury
("Treasury"), Secretary of the United States Treasury Department
("Secretary"), United States Bureau of Public Debt ("Bureau"),
and Commissioner of Public Debt, move to dismiss the Fourth
Amended Complaint pursuant to Federal Rule of Civil Procedure
("Rule") 12(b).  (Dkt. entry no. 93.)  The Court has considered
the papers submitted by the parties and heard oral argument on
October 29, 2009.  (Dkt. entry no. 100.)  For the reasons stated
below, the Court will grant defendants' motion.

                            BACKGROUND

Plaintiffs, the Treasurers of the States of New Jersey,
North Carolina, and Oklahoma, and the Commonwealth of Kentucky;
the Attorney General of Missouri; and the Director of the

Department of Revenue of Montana (the "States"), brought this action to recover proceeds of fully matured, unredeemed United States savings bonds (the "bonds") that are in the custody of the Bureau, a division of Treasury. (Dkt. entry no. 73, 4th Am. Compl. at 1.)[1]  Although the bonds have matured, in some cases decades ago, their proceeds remain in the custody of the Bureau and there has been no communication between the Bureau and the bonds' owners either at the time of maturation or thereafter. (Id. at 2.)  The States assert that Treasury has possession of over $15 billion worth of unclaimed, matured bonds, of which $1.6 billion constitutes bonds registered to owners whose last known addresses are in the plaintiff States.  (Id.)

---

[1] This motion to dismiss pertains to the Fourth Amended Complaint.  (Dkt. entry no. 73.)  However, subsequent to oral argument on this motion, the States sought leave to amend that Complaint to add the Treasurer of Pennsylvania, Rob McCord, as a plaintiff.  (Dkt. entry no. 105.)  Defendants consented to the amendment because the proposed amendment was limited to the addition of the new plaintiff and because the proposed order preserved all objections.  (Dkt. entry no. 106.)  The Magistrate Judge therefore granted leave to amend and ordered the filing of the Fifth Amended Complaint.  (Dkt. entry no. 107, 1-13-10 Order; dkt. entry no. 108, Fifth Am. Compl.)  Because the parties briefed this motion to dismiss with reference to the Fourth Amended Complaint, the Court cites to the Fourth Amended Complaint in this opinion, noting that it is substantively identical to the Fifth Amended Complaint with the exception of the addition of McCord as a plaintiff.

I.   **The Federal Savings Bond Program**

A.   **31 U.S.C. § 3105**

Congress, pursuant to its Constitutional power to borrow money on the credit of the United States,[2] delegated authority to the Secretary, with the approval of the President, to issue savings bonds and savings certificates of the United States Government, to be used "for expenditures authorized by law."  31 U.S.C. § 3105(a).[3]  The Secretary may fix the investment yield for savings bonds, and may change the investment yield on outstanding savings bond as long as it is above the minimum yield guaranteed on the date of issue.  Id. § 3105(b)(1).  The statute further provides that

> (2)   The Secretary may prescribe regulations providing that—
>
> (A) owners of savings bonds may keep the bonds after maturity or after a period beyond maturity during which the bonds have earned interest and continue to earn interest at rates consistent with [§ 3105(b)(1)]; and
> (B) savings bonds earning a different rate of interest before the regulations are prescribed shall earn a rate of interest consistent with [§ 3105(b)(1)].

Id. § 3105(b)(2).

The Secretary may prescribe the following conditions in regulating the federal savings bond program:

---

[2] U.S. Const. art. 1, § 8, cl. 2.

[3] This statute was previously codified at 31 U.S.C. § 757c.

3

> (1) the form and amount of an issue and series;
> (2) the way in which they will be issued;
> (3) the conditions, including restrictions on transfer, to which they will be subject;
> (4) conditions governing their redemption;
> (5) their sales price and denominations;
> (6) a way to evidence payments for or an account of them and to provide for the exchange of savings certificates for savings bonds; and
> (7) the maximum amount issued in a year that may be held by one person.

Id. § 3105(c).  With regard to redemption of federal savings bonds, Congress authorized the Secretary to "authorize financial institutions to make payments to redeem savings bonds" provided that, inter alia, the financial institution "is qualified under regulations prescribed by the Secretary."  Id. § 3105(d)(5).

A majority of the bonds at issue in this case are Series E bonds, issued between 1941 and 1980.  (4th Am. Compl. at 10.) The last Series E bonds sold will mature in 2011.  (Id.)

**B.    Relevant Implementing Regulations**

The Secretary has promulgated regulations governing the federal savings bond program, which are codified at 31 C.F.R. Part 315 (governing savings bonds designated Series A, B, C, D, E, F, G, H, J, and K, and savings notes) and 31 C.F.R. Part 353 (governing Series EE and HH savings bonds bearing issue dates of January 1, 1980, or thereafter).

Relevant to this action, the regulations provide specific mechanisms for and restrictions on registration of the bonds, which is conclusive of ownership, 31 C.F.R. § 315.5; reissuance of bonds to add a co-owner or beneficiary or name a new owner, 31 C.F.R. § 315.47; to correct an error in the registration, 31 C.F.R. § 315.49; or to reflect the owner's name change, 31 C.F.R. § 315.50.  See also 31 C.F.R. §§ 353.47, 353.49, & 353.50. "Savings bonds are not transferable and are payable only to the owners named on the bonds," except as otherwise provided in the regulations.  31 C.F.R. §§ 315.15, 353.15.  The regulations set forth the rules by which the bonds are payable by Treasury upon maturity, referred to as "redemption" of the bonds.  See 31 C.F.R. § 315.35 ("Payment of a savings bond will be made to the person or persons entitled under the provisions of these regulations. . . ."); 31 C.F.R. § 315.39 (the owner of a bond "may present the bond to an authorized paying agent for redemption," establish his or her identity, and sign the request for payment on the bond, to be paid by check "drawn against the funds of the United States"); 31 C.F.R. § 315.43 ("Treasury will treat the receipt of a bond with an appropriate request for payment by:  (a) A Federal Reserve Bank or Branch, (b) The Bureau of Public Debt, or (c) A paying agent authorized to pay that bond, as the date upon which the rights of the parties are fixed

5

for the purpose of payment."). <u>See also</u> 31 C.F.R. §§ 353.35,
353.39, & 353.43 (corresponding regulations pertaining to Series
EE and HH savings bonds).

The Treasury regulations governing the federal savings bond
program constitute a valid exercise of Congressional authority
and have the force of federal law. <u>Yiatchos v. Yiatchos</u>, 376
U.S. 306, 309 (1964); <u>In re Cochran's Estate</u>, 159 A.2d 514, 519
(Pa. 1960); <u>Franklin Washington Trust Co. v. Beltram</u>, 29 A.2d
854, 856 (N.J. 1943). A federal savings bond, upon its purchase,
becomes a contract between the bond owner and the United States.
<u>Rotman v. United States</u>, 31 Fed.Cl. 724, 725 (1994). The
Treasury regulations governing the savings bond program are an
implied part of that contract. <u>See Wolak v. United States</u>, 366
F.Supp. 1106, 1110 (D. Conn. 1973).

## II. **State Custody-Based Escheat Laws**

The States claim that the bonds are unclaimed property of
State residents within the meaning of the New Jersey Uniform
Unclaimed Property Act, N.J.S.A. § 46:30B-1 <u>et seq.</u>, the North
Carolina Escheat and Unclaimed Property Act, N.C. Gen. Stat. §
116B-1 <u>et seq.</u>, the Kentucky statutes regarding Descent, Wills
and the Administration of Decedents' Estates, Ky. Rev. Stat. Ann.
§§ 393.010 <u>et seq.</u>, the Montana Uniform Unclaimed Property Act,
Mont. Code Ann. § 70-9-801 <u>et seq.</u>, the Oklahoma Uniform

Unclaimed Property Act, Okla. Stat. tit. 60, § 651 <u>et seq.</u>, the Missouri Uniform Disposition of Unclaimed Property Act, Mo. Rev. Stat. §§ 447.500 to 447.595, and the Pennsylvania statutes regarding Disposition of Abandoned and Unclaimed Property, 72 Pa. Stat. Ann. § 1301.1 <u>et seq.</u> (collectively, the "State Acts"). Each of the State Acts is a "custody" escheat statute, rather than a "title" escheat statute, in that title to abandoned property does not pass to the State but instead the State obtains custody and beneficial use of the property pending identification of the property's owner.  <u>See</u> N.J.S.A. § 46:30B-61; N.C. Gen. Stat. § 116B-63(b); Mont. Code Ann. § 70-9-801; Okla. Stat. tit. 60, § 657.4; Ky. Rev. Stat. Ann. § 393.020 (unclaimed property "shall vest in the state, subject to all legal and equitable demands. . . ."); Mo. Rev. Stat. § 447.543 (establishing an abandoned fund account upon which claims to unclaimed property may be made); 72 Pa. Stat. Ann. § 1301.2.[4]

The States claim that the State Acts oblige Treasury to "report and deliver all Unclaimed Bonds to the States' custody for reunification with their citizen-owners."  (Dkt. entry no. 97, Pl. Br. at 1.)  Many of the State Acts have specific provisions for presuming abandoned property held by or obligating

---

[4] The States represent that all 50 states have enacted similar custody-based unclaimed property statutes.  (4th Am. Compl. at 3.)

the United States Government.  See N.J.S.A. § 46:30B-41.2
(presuming abandoned property unclaimed for more than one year
after it became payable by "the executive, legislative, or
judicial branch of the United States Government"); N.C. Gen.
Stat. § 116B-53(c)(12) (presuming abandoned any property "held by
a court, government, governmental subdivision, agency, or
instrumentality, one year after the property becomes
distributable"); Okla. Stat. tit. 60, § 657 (property held by
state or other government presumed abandoned after one year); Ky.
Rev. Stat. Ann. § 393.068 (property held by the federal
government presumed abandoned if it remains unclaimed for more
than five years); Mo. Rev. Stat. § 447.532 (property held by any
agency or department of the United States deemed abandoned if
unclaimed for more than three years); Mont. Code Ann. § 70-9-
803(k) (property held by a government or governmental subdivision
one year after the property becomes distributable presumed
abandoned); 72 Pa. Stat. Ann. § 1301.9 (any property held for the
owner by any "instrumentality of the United States" unclaimed for
five years from the date it first became demandable or
distributable presumed abandoned).

**III. Treasury's Position Regarding Unclaimed Savings Bonds**

Defendants contend that the States' unclaimed property laws
do not apply to the unclaimed bonds because, inter alia, "the

8

savings bond program is a primary constitutional function of the
United States, and the States' attempts to regulate it are barred
by the Supremacy Clause."  (Dkt. entry no. 93, Def. Br. at 2.)
Defendants note that the Treasury regulations "permit redemption
of savings bonds by a state only where the state has obtained
ownership of the bonds through an escheat process that satisfies
due process"; specifically, a state must go through a judicial
proceeding to take title to the bonds in order to redeem them and
take the proceeds thereof.  See 31 C.F.R. § 315.20(b) ("Treasury
will recognize a claim against an owner of a savings bond and
conflicting claims of ownership of, or interest in, a bond
between coowners or between the registered owner and the
beneficiary, if established by valid, judicial proceedings"); id.
§ 315.23 (setting forth requirements for establishing validity of
judicial proceedings).  (Def. Br. at 4.)

     Based on its interpretation of the pertinent federal statute
and regulations, Treasury has taken the position that it will
comply with title-based escheat laws, but not custody-based
escheat laws, with regard to the proceeds of unclaimed bonds.
(Def. Br. at 9 & dkt. entry no. 93, Decl. of David Dauenheimer
("Dauenheimer Decl.") Ex. 1, Bureau Bulletin dated 2-27-52 ("1952
Bulletin").)  The 1952 Bulletin issued by the Bureau reprints a
letter from the Secretary of the Treasury to the Comptroller of

9

the State of New York explaining Treasury's position on "the
prospective right[] of the State of New York . . . to receive
payment of certain United States securities of which it is not
the registered owner."  (1952 Bulletin at 1.)  The Secretary
explained that for Treasury to comply with the New York Abandoned
Property Law by paying the proceeds of unredeemed savings bonds
into the custody of the state, even though the state had physical
possession of the abandoned bonds, would result in either one of
two undesirable outcomes:

> [T]he [custody-based escheat proceedings] either
> provide the obligor with a discharge, valid within and
> without New York, or fail to provide such discharge.
> If the discharge is provided in the case of the
> ordinary debtor, then the other party to the contract
> has substituted for his right to pursue his obligor in
> any jurisdiction, a right merely to prosecute a claim
> against the State Comptroller of New York; if an
> effective discharge is not provided, the obligor is
> subject to suit outside the State of New York and the
> necessity of making double payment – in exchange he has
> a right to claim relief from the Comptroller under
> . . . [New York's] Abandoned Property Law.

(Id. at 2.)  The Treasurer concluded that Treasury's compliance
with the New York Abandoned Property Law would unconstitutionally
affect the contract between the federal government and the bond
owner.  (Id. at 3.)  Finally, the Treasurer distinguished that
the state was not purporting to assert any ownership interest in
the bonds, but merely a custodianship that would recognize the

10

continued existence of the owner's claim; while such an
arrangement would violate the agreement of the United States with
the owner, it would be permissible under the Treasury regulations
for the state to assert an interest in the bonds as a successor
in title or as administrator of the owner's estate.  (Id. at 3-
4.)

The record in this case also includes a September 6, 1983
letter from Treasury to the Secretary of Revenue of Kentucky.
(Dauenheimer Decl., Ex. 2.)  In response to the Kentucky
officer's request for "instructions for the payment of abandoned
bonds and notes to the Commonwealth of Kentucky," the letter
advised in pertinent part:

> [Treasury's] position is that claims by States for
> payment of United States securities will be recognized
> only where the States have actually succeeded to the
> title and ownership of the securities pursuant to valid
> escheat proceedings.  The Department does not recognize
> claims for payment by a State acting merely as
> custodian of unclaimed or abandoned securities and not
> as successor in title and ownership of the securities.
> . . . because in such case payment of the securities
> results in the full discharge of the Treasury's
> obligation and this discharge is valid in all
> jurisdictions.  Payment of securities to a State
> claiming only as a custodian results in the
> substitution of the State for the Department of the
> Treasury as obligor on the securities.

(Id. at 1.)

11

More recently, Treasury posted a question and answer on its website as a "Frequently Asked Question" ("FAQ") for E and EE Series savings bonds pertaining to the issue at hand.[5]  The FAQ was first made available in 2000.  (Pl. Br. at 4 & n.3.)  The question asks:  "In a state that has a permanent escheatment law, can the state claim the money represented by securities that the state has in its possession?"  The States refer to Treasury's FAQ answer as the "Escheat Decision," which states:

> The Department of the Treasury will recognize claims by States for payment of United States securities where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings.  The Department, however, does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.
>
> In other words, the Treasury recognizes escheat statutes that provide that a State has succeeded to the legal ownership of securities because in such case payment of the securities results in full discharge of the Treasury's obligation and this discharge is valid in all jurisdictions.
>
> But, payment of securities to a State claiming only as a custodian results in the substitution of one obligor, the Department of the Treasury, for another, the State. Not only is there serious question whether there is authority for a State to effect such a substitution, but there also seems to be no basis for believing that

---

[5] This FAQ is available at http://www.treasurydirect.gov/indiv/research/indepth/ebonds/res_e _bonds_eefaq.htm (last visited Feb. 3, 2010).

> payment to a State custodian would discharge Treasury
> of its obligation.  Even if the discharge were claimed
> effective in the State to which the payment is made, it
> is believed that the Treasury's obligation and
> liability would still remain in force in all other
> jurisdictions.

(See supra n.5; dkt. entry no. 97, Pl. Br., Ex. 4, Part 1, "EE/E
Savings Bonds FAQs" ("Escheat Decision").)  The States and
defendants have stipulated in this action that the answer to this
question "is defendants' interpretation of federal savings bond
regulations . . . and reflects defendants' understanding of
existing laws."  (Dauenheimer Decl., Ex. 3, at ¶ 3.)

      Defendants argue that they have thus "consistently
interpreted the laws and regulations concerning redemption of
U.S. savings bonds" since 1952, and assert that they have no
intention of changing the website statement or otherwise
deviating from its policy.  (Id. at ¶¶ 4-5; Def. Br. at 9.)

## IV.  Procedural Posture of This Case

      The Treasurer of the State of New Jersey originally brought
this action in September 2004.  (Dkt. entry no. 1, Compl.)  North
Carolina joined the action shortly thereafter.  (Dkt. entry no.
2, Am. Compl.)  Defendants moved to dismiss the Amended Complaint
for lack of jurisdiction or, in the alternative, transfer the
action to the Court of Federal Claims.  (Dkt. entry no. 9, Mot.
to Dismiss.)  The Court denied the part of the motion seeking to

dismiss, but granted the part of the motion seeking transfer, and entered an order transferring the action to the Court of Federal Claims.  (Dkt. entry no. 22, 7-29-05 Order.)  The States appealed the transfer.  (Dkt. entry no. 26, Notice of Appeal.)

The United States Court of Appeals for the Federal Circuit held on June 15, 2006, that the Court of Federal Claims lacked jurisdiction over this matter and remanded the action to this Court for further proceedings.  McCormac v. U.S. Dep't of Treasury, 185 Fed.Appx. 954 (Fed. Cir. 2006).  In the proceedings before the Federal Circuit, defendants conceded that they erred in requesting a transfer to the Court of Federal Claims, and the Federal Circuit agreed with the parties that jurisdiction in that court was lacking because the States "do not assert a contractual relationship . . . that provides a substantive right to money damages" so as to invoke the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491(a)(1).  Id. at 955.  The Federal Circuit noted that "although the States are asserting a claim that involves a contract, they are not asserting a contract claim for money damages against the government. . . . The States are not named parties to the bond contract, such that there is no privity between the States and the Government."  Id. at 956.

14

Following the Federal Circuit's decision, the parties engaged in discovery limited to the issues of ripeness and final agency action.  (Dkt. entry no. 41, Scheduling Order at 1.)  The States amended the Complaint on several occasions to add representatives of the States of Montana, Oklahoma, and Missouri, and the Commonwealth of Kentucky, as plaintiffs, and to add a claim alleging that defendants' Escheat Decision violated the Tenth Amendment and the notice and comment provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. § 553.  (Dkt. entry no. 62, 2nd Am. Compl.; dkt. entry no. 70, 3d Am. Compl.; Pl. Br. at 4.)

Defendants moved in November 2008 to dismiss the Third Amended Complaint on jurisdictional grounds, or for summary judgment on the basis of the Supremacy Doctrine.  (Dkt. entry no. 75, Def. Mot. Dismiss & for Summ. J.)  The States, _inter alia_, opposed the motion to dismiss and for summary judgment.  (Dkt. entry nos. 78, 79, 80.)  The Court heard oral argument on June 8, 2009, and, _inter alia_, denied defendants' motion without prejudice.  (Dkt. entry no. 88, 6-8-09 Order.)  The Court granted defendants leave to file a motion to dismiss pursuant to Rule 12(b) only.  (_Id._)  On July 8, 2009, defendants filed the instant motion to dismiss the Fourth Amended Complaint.  (Dkt. entry no. 93.)

15

The States' Fourth Amended Complaint seeks an order, <u>inter alia</u>, (1) declaring that defendants have violated federal law and the state Unclaimed Property Acts by failing to report and deliver to the States the amounts due and owing under savings bonds that have matured but have not yet been redeemed by the bond owners, (2) directing defendants to report and deliver the bonds to each State according to the last known addresses of the bond owners and provide adequate accountings, (3) declaring Treasury's Escheat Decision invalid for having been implemented without notice and comment rule-making under the APA, and (4) declaring Treasury's Escheat Decision in violation of the Tenth Amendment of the United States Constitution.  (4th Am. Compl. at 24-25.)

Defendants argue that dismissal under Rule 12(b)(1) for lack of jurisdiction is appropriate because the States have not established a waiver of the United States' sovereign immunity, and that the States lack standing to bring the instant suit. (Def. Br. at 16-29.)  In the alternative, defendants seek dismissal of the Fourth Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) because the States' claims are barred by the Supremacy Doctrine, the States' claims are preempted by federal law, intergovernmental immunity bars the States' claims, and because the States' arguments based on the

16

Tenth Amendment and alleged failure to comply with the notice and comment provisions of the APA lack merit.  (Def. Br. at 30-44.)

## DISCUSSION

This Court may consider the merits of a claim before resolving difficult jurisdictional issues, and thus will consider defendants' arguments predicated on Rule 12(b)(6) first, followed by consideration of the jurisdictional issues raised by defendants in their motion to dismiss pursuant to Rule 12(b)(1).  See, e.g., Switlik v. Hardwicke Co., Inc., 651 F.2d 852, 856 n.3 (3d Cir. 1981); see also Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690 (1949) (noting that "the jurisdiction of the court to hear the case may depend . . . upon the decision which it ultimately reaches on the merits").

## I.    Applicable Legal Standards

### A.    Rule 12(b)(6)

In addressing a motion to dismiss a complaint under Rule 12(b)(6), the Court "must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  At this stage, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is

17

plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--that the 'pleader is entitled to relief.'" <u>Iqbal</u>, 129 S.Ct. at 1950 (quoting Rule 8(a)(2)).

Defendants invoke Rule 12(b)(6) as a basis for dismissal because the States' (1) claims are barred by the Supremacy Doctrine, (2) Tenth Amendment claim fails to state a claim, and (3) claim based on the notice and comment provisions of the APA, 5 U.S.C. § 553, fails to state a claim.  (Def. Br. at 30-44.)

**B.    Rule 12(b)(1)**

A defendant may move to dismiss a claim for lack of subject matter jurisdiction under Rule 12(b)(1).  Fed.R.Civ.P. 12(b)(1). Such motion may be made at any time.  <u>Iwanowa v. Ford Motor Co.</u>, 67 F.Supp.2d 424, 437-38 (D.N.J. 1999).  The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction.  <u>Id.</u> at 438.  Under this

18

standard, a court assumes that the allegations in the complaint are true, and may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction.  Cardio-Med. Assoc., Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir. 1983); Iwanowa, 67 F.Supp.2d at 438.

A defendant can also attack subject matter jurisdiction by factually challenging the jurisdictional allegations set forth in the complaint.  Iwanowa, 67 F.Supp.2d at 438.  Under this standard, "no presumptive truthfulness attaches to plaintiff's allegations and the existence of disputed material facts will not preclude the Court from evaluating for itself the merits of jurisdiction claims."  Pashun v. Modero, No. 92-3620, 1993 U.S. Dist. LEXIS 7147, at *6 (D.N.J. May 26, 1993).  The Court may consider affidavits, depositions, and testimony to resolve factual issues and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. Iwanowa, 67 F.Supp.2d at 438.

Defendants seek dismissal pursuant to Rule 12(b)(1) on the basis that sovereign immunity bars the States' claims. Defendants also contend that the waiver of sovereign immunity found in the APA does not apply here, and in the alternative,

19

that the States lack standing under the APA and the statute of
limitations has run.  (Def. Br. at 16-26.)[6]

## II.  Defendants' Arguments Based on Rule 12(b)(6)

### A.  Supremacy Doctrine, Preemption, and Intergovernmental Immunity

Article VI, clause 2, of the United States Constitution
provides that the "Constitution, and the Laws of the United
States which shall be made in Pursuance thereof . . . shall be
the supreme Law of the Land; and the Judges in every State shall
be bound thereby, any Thing in the Constitution or Laws of any
State to the Contrary notwithstanding."  U.S. Const. art. VI, cl.
2 ("Supremacy Clause").  Pursuant to the Supremacy Clause, "any
state law, however clearly within a State's acknowledged power,
which interferes with or is contrary to federal law, must yield."
Free v. Bland, 369 U.S. 663, 666 (1962) (citing Gibbons v. Ogden,
22 U.S. (9 Wheat.) 1, 82 (1824)).

Defendants urge that the States' demand for custody of the
bonds conflicts with federal law and the federal prerogative,
embodied in the Constitution, to "borrow Money on the credit of
the United States" and to "pay the Debts . . . of the United

---

[6] Because it became clear to the Court after reviewing the
parties' written submissions that even if some portion of the
claims are time-barred, the statute of limitations would not
preclude the action in its entirety, the Court declines to
address the parties' statute of limitations arguments here.

States."  U.S. Const. art. 1, § 8, cl. 1-2; see Alabama v. Bowsher, 734 F.Supp. 525, 540 (D.D.C. 1990) ("Bowsher I"), aff'd sub nom. Arizona v. Bowsher, 935 F.2d 332 (D.C. Cir. 1991) ("Bowsher II") ("When the United States disburses its funds or pays its debts, it is exercising a constitutional function.") (quotation omitted); United States v. Dauphin Deposit Trust Co., 50 F.Supp. 73, 75 (M.D. Pa. 1943) (recognizing issuance of federal savings bonds as an exercise of Congress's power under Article 1, § 8, cl. 2).  (See also dkt. entry no. 101, 10-29-09 Hr'g Tr. at 3:3-6 ("The state's [sic] intrusive laws here interfere impermissibly with the government's core federal function of raising and spending monies on behalf of the federal government.").)

Pursuant to the Supremacy Clause, the Supreme Court of the United States has identified three types of situations where federal law preempts state law:

> (1) "express" preemption, applicable when Congress expressly states its intent to preempt state law;
> (2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and
> (3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts

21

with federal law," even though Congress has not
displaced all state law in a given area.

Colacicco v. Apotex Inc., 521 F.3d 253, 261 (3d Cir. 2008)

(quoting Hillsborough County v. Automated Med. Labs., Inc., 471

U.S. 707, 713 (1985)), cert. granted, judgment vacated on other

grounds, 129 S.Ct. 1578 (2009).  Defendants argue that field

preemption and conflict preemption bar the States' claims.  (Def.

Br. at 31, 34.)  The Court notes the relevancy of the applicable

federal laws and regulations to the merits of this action in any

event, given that "[i]n framing a State's power of escheat, we

must first look to the law that creates property and binds

persons to honor property rights," in this instance the federal

laws creating the federal savings bond program and its

implementing regulations.  Delaware v. New York, 507 U.S. 490,

501 (1993).

       **1.**    **Field Preemption**

Field preemption occurs when state law impinges on a "field

reserved for federal regulation," leaving no room for state

regulation.  United States v. Locke, 529 U.S. 89, 111 (2000).  It

exists where either "the nature of the regulated subject matter

permits no other conclusion, or . . . Congress has unmistakably

so ordained."  Fla. Lime & Avocado Growers, Inc. v. Paul, 373

U.S. 132, 142 (1963).

## 2.   Conflict Preemption

Conflict preemption is implicated when, "under the circumstances of a particular case, the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Deweese v. Nat'l R.R. Passenger Corp., 590 F.3d 239, 246 (3d Cir. 2009) (quotation and alterations omitted).  "The purpose of Congress is the ultimate touchstone in every pre-emption case," such that preemption occurs equally where compliance with the challenged state law stands as an obstacle to Congressional purposes as it does when Congress has expressly preempted state law.  Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quotation omitted).

> [W]hen the question is whether a Federal act overrides
> a state law, the entire scheme of the statute must of
> course be considered and that which needs must be
> implied is of no less force than that which is
> expressed.  If the purpose of the act cannot otherwise
> be accomplished--if its operation within its chosen
> field else must be frustrated and its provisions be
> refused their natural effect--the state law must yield
> to the regulation of Congress within the sphere of its
> delegated power.

Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (quoting Savage v. Jones, 225 U.S. 501, 533 (1912)).

## 3.   Intergovernmental Immunity

Defendants argue that enforcement of the States' custodial escheat laws as to Treasury would violate the intergovernmental

immunity doctrine, which provides that "the activities of the Federal Government are free from regulation by any state" except to the extent that Congress expressly provides otherwise. Hancock v. Train, 426 U.S. 167, 178-79 (1976).  (Def. Br. at 38.) In the absence of Congressional consent, "there is an implied constitutional immunity of the national government from . . . state regulation of the performance, by federal officers and agencies, of governmental functions."  Penn Dairies, Inc. v. Milk Control Comm'n, 318 U.S. 261, 269 (1943).

Defendants contend that imposition of the States' custodial escheat laws, which contain "burdensome record keeping and extremely copious reporting requirements," would impermissibly interfere with the Constitutional dictate to Congress of the "[p]ower to dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States. . . ."  U.S. Const. art. IV, § 3, cl.2.  (Def. Br. at 39.)  The States have not pointed to any "clear congressional mandate" that would allow the States to impose the operation of the State Acts on Treasury for the purpose of taking custody of the unclaimed bond proceeds.  Hancock, 426 U.S. at 179.  We observe that the absence of a federal statute or regulation specifically providing for the disposition of unclaimed savings bond proceeds thus weighs in favor of defendants' intergovernmental immunity

24

argument more than it suggests that Congress has reserved that question to the States.

To the extent the States assert this case is about mere custody of the bonds, they gloss over the effect of other aspects of the State Acts.  The State Acts, in addition to imposing onerous record-keeping and reporting requirements, also contain civil and criminal penalties for failure to comply, which would impermissibly "regulate" defendants.  See Bowsher I, 734 F.Supp. at 542 & n.18 ("It is ludicrous to imply that Congress intended to subject the Secretary not just to state reporting and disbursing requirements but also to monetary penalties and/or jail time for failure to comply. . . . The plaintiffs do not dispute that their laws in fact provide for the imposition on 'holders'–which the plaintiffs contend the Secretary is–of unclaimed property for failure to comply with their disbursing and reporting provisions.").[7]  The States also attempt to

---

[7] See, e.g., N.J.S.A. §§ 46:30B-103 to -105; N.C. Gen. Stat. § 116B-77; Ky. Rev. Stat. Ann. § 393.990 (imposing penalty for refusal to comply with reporting duties of a fine up to $200, imprisonment for up to six months, or both); Mont. Code Ann. § 70-9-824; Okla. Stat. tit. 60, § 680 (imposing financial penalties for failure to report or deliver property, and making failure to comply with written demand by state treasurer to pay or deliver property a misdemeanor punishable by a fine of up to $5,000, six months imprisonment, or both); Mo. Rev. Stat. § 447.577 (noncompliance a misdemeanor offense subject to a criminal fine); 72 Pa. Stat. Ann. § 1301.25 (failure to comply a misdemeanor punishable by a fine up to $10,000 and twenty-four months imprisonment, or both).

overcome defendants' concern that State custody of unclaimed bond proceeds could result in multiple obligations on the same bond by the United States, by asserting that Treasury could seek indemnification from a State pursuant to that State's statutes. (Pl. Br. at 38.)  We find, however, that such a procedure would likely run afoul of the intergovernmental immunity doctrine by creating an obligation and an unnecessary step that would burden the federal government.

### 4.   Court's Findings as to Preemption

As the States point out, Congress has not expressly stated what should happen to unclaimed mature savings bonds.  (Pl. Br. at 29, 31-33.)  The States argue that in the absence of a "clear and manifest" federal intention to preempt escheat laws, field preemption cannot apply.  (Id. at 31-36.)  The Court finds that conflict preemption, rather than field preemption, provides the proper paradigm for this case.  We conclude that principles of federal supremacy and implied conflict preemption dictate here that the States' claims be dismissed.

The States' proposal for taking custody of the bonds and, in effect, assuming the federal government's obligation to the holders of the bonds, would impermissibly interfere with the contract between the United States and the owner of the bond and conflict with the narrow regulations governing redemption of the

bonds.  (10-29-09 Hr'g Tr. at 24:12-16; <u>see also</u> Pl. Br. at 32 ("This action seeks only the custodial relinquishment of the principal and interest of matured savings bonds.").)[8]  "[T]here is a necessity of the recognition of the supremacy of the federal law in a matter relating to the borrowing power of Congress, and the necessity of a uniform procedure relating to federal savings bonds in all states, [such that] no state statute or rule of law may stand in the way of enforcing the applicable federal law embodied in the contract as made."  <u>Nelson v. Wheeler</u>, 256 P.2d 1080, 1084 (Mont. 1953) (holding that attempted gift <u>causa</u> <u>mortis</u> of federal savings bonds that would be effective under state law was invalid due to strict federal regulations governing transferability); <u>see also</u> <u>Curry's Estate v. United States</u>, 409 F.2d 671, 673 (6th Cir. 1969) ("That there should be one law regulating United States savings bonds is a matter of necessity,

---

[8] At oral argument, the States' counsel sought to explain the relief sought and distinguish that relief from redemption of the bonds:

> [A]ll we're asking [defendants] to do is give us the identity [of the bond owners] and the obligation, your obligation, meaning send money with the identity of the person because our job under the Constitution is to find that person and get them the money.  It's not redemption.  It's not a payment on the bond.

(10-29-09 Hr'g Tr. at 24:12-16.)

and this must be the law of the Federal government which issues the bonds.") (quotation and citation omitted).

That Congress did not intend for the federal savings bond proceeds to be subject to the State Acts is manifest in Congress's failure to adopt a bill introduced in the first session of the 100th Congress, the Unclaimed Property Act of 1987. See S. 1612, 100th Cong. (1987); H.R. 4298, 100th Cong. (1988). That bill would have provided the relief sought here by the States by requiring federal agencies to turn over unclaimed funds to the States instead of the funds remaining in Treasury's custody. The sponsor of the Unclaimed Property Act of 1987 specifically contemplated that the redemption value of outstanding savings bonds would be transferred from the Bureau to the States. (Dauenheimer Decl., Ex. 4, 1989 General Accounting Office Report, "Unclaimed Money: Proposals for Transferring Unclaimed Funds to States" ("GAO Report") at 50.) However, the bill never became law. See Bowsher I, 734 F.Supp. at 541 n.17. The existence and non-adoption of this and other similar proposals suggests an understanding by Congress that a federal law would be a necessary prerequisite to the applicability of the State Acts to the federal savings bond program.

The States attempt to distinguish redemption of the bonds from custody of the bonds, asserting that they do not seek

28

redemption of the bonds and that the Federal Circuit accepted the States' representation that they seek to "act [] as a conservator, not as a party to a contract." <u>McCormac</u>, 185 Fed.Appx. at 956.  (Pl. Br. at 26, 36.)[9]  The Court notes initially that if the States did in fact seek redemption of the bonds, they would be free do to so by initiating judicial escheat proceedings culminating in the States' taking title to unclaimed bonds.  <u>See</u> 31 C.F.R. §§ 315.20, 315.23; Escheat Decision. Second, the States' insistence that they merely seek "custody" or to act as a "conservator" does not cure the problem that the proposed "conservatorship" would still impermissibly interfere with the redemption scheme set forth in the Treasury regulations. (<u>See</u> Pl. Br. at 32 ("This action seeks only the custodial

---

[9] The States characterize the Federal Circuit's opinion as holding that this action is "not about" the "ownership, transfer, and redemption of U.S. savings bonds" for purposes of the law of the case and conclude that this "holding" necessarily means the State Acts "do not conflict with regulations which      . . . place conditions upon owners when redeeming bonds."  (Pl. Br. at 36-37.)  We disagree.  The Federal Circuit opinion oft-cited by the States "held" no such thing.  Instead, the Federal Circuit merely noted that the States did not "assert that they currently have title to the bonds," but rather "seek custody rights originating in their escheat statutes."  <u>McCormac</u>, 185 Fed.Appx. at 956.  No party suggests that the States seek to enforce a contractual right, and it is uncontroverted that the bonds constitute contracts between the bond owners and the United States.  The relevant dispute, which was not addressed by the Federal Circuit, pertains to whether the effect of the relief sought conflicts with federal law so as to be preempted pursuant to the Supremacy Clause.

relinquishment of the principal and interest of matured savings bonds, no more than what the government obligated itself to do when it sold the securities.").)  To the extent that the States wish to assume Treasury's obligation to the owners by means of taking "custody" of the bond proceeds, the States necessarily attempt to interfere with the savings bond contract by altering the right of the owner to redeem the bond according to the procedure set forth in the Treasury regulations, including being paid by Treasury.[10]

_____

[10] The States' reliance on Standard Oil Co. v. New Jersey, 341 U.S. 428 (1951), for the proposition that state escheat statutes do not alter contractual obligations, is inapposite here.  (Pl. Br. at 37.)  In Standard Oil Co., the plaintiff objected to New Jersey's escheat of unclaimed stock dividends on the basis, inter alia, that it violated the Contracts Clause of the United States Constitution, U.S. Const. art. 1, § 10 ("No State shall . . . make any . . . Law impairing the Obligation of Contracts. . . ."). Id. at 431.  The Court found no impairment of contract by operation of the escheat statute because such a contract for owning stock and being owed dividends thereupon would not normally include a contractual arrangement for disposition in case of an owner's failure to claim such dividends.  Id. at 436. At issue here, in contrast, is the supremacy of federal regulations providing a particular procedure for the issuance, transfer, and redemption of bonds.  Moreover, the policy underlying the Court's decision in Standard Oil Co. was that state escheat was appropriate in that instance because it allowed the unclaimed property to be "used for the general good rather than the chance enrichment of particular individuals or organizations." Id.  Here, in contrast, the funds the States seek "custody" of are perfectly capable of benefitting the general good (through "expenditures authorized by law," 31 U.S.C. § 3105(a), or "to pay the Debts" of the United States, U.S. Const. art. I, § 8, cl. 1) in the custody of the United States Treasury, as opposed to situations such as the one in Standard Oil Co., where a corporation stood to gain a windfall from the

The States' proposed relief would effectively replace the promulgated redemption process and potentially expose Treasury to multiple obligations on a single bond, and would therefore also "intrude upon the rights and the duties of the United States" by altering the obligation to involve the States.  Free, 369 U.S. at 669; Franklin Washington Trust Co., 29 A.2d at 856 ("No state law can vary the terms of the Federal obligations or derogate them from their full enforceability.").  (See GAO Report at 41 ("Bureau officials stated that the continuing responsibility to pay matured savings bondholders would make double payments a certainty.").)  Permitting the States to take custody of the bond proceeds convolutes the redemption process and "could well lead to chaotic conditions with respect to savings bonds and to great potential for abuse," not least because the State Acts differ from one another in terms of their requirements, time period for presumption of abandonment of property, and penalties for failure

_____

unclaimed property.  See Buchanan v. Alexander, 45 U.S. 20, 20-21 (1846) ("The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by state process or otherwise, the functions of the government may be suspended.  So long as money remains in the hands of a disbursing officer, it is as much the money of the United States, as if it had not been drawn from the treasury."); see also The Legal Tender Cases, 110 U.S. 421, 444 (1884) ("The power 'to borrow money on the credit of the United States' is the power to raise money for the public use on a pledge of the public credit, and may be exercised to meet either present or anticipated expenses and liabilities of the government.") (emphasis added).

to comply.  United States v. Chandler, 410 U.S. 257, 261-62
(1973).  The States' assertion that "[e]ach of the states
statutes at issue provides that the federal government will be
indemnified if it redeems a bond after escheat" only highlights
that the State Acts impermissibly alter the redemption process so
specifically laid out in the relevant regulations.  (Pl. Br. at
38.)  Finally, the federal statute authorizing the federal
savings bond program reserves bond proceeds for "expenditures
authorized by law"--that is, federal law.  31 U.S.C. § 3105(a).

     The federal savings bond program clearly contemplates that
the owners of savings bonds may keep the bonds for a period
beyond maturity.  31 U.S.C. § 3105(b)(2) ("The Secretary may
prescribe regulations providing that . . . owners of savings
bonds may keep the bonds after maturity . . . ").  Thus, Congress
was not silent on the issue of unredeemed mature bonds, as urged
by the States, and the justification for the State Acts--the
presumption of abandonment after just one year of maturity--has
little application to the federal savings bond program.  The
federal savings bond program, intended to raise money for the
federal government and encourage thrift and savings by small
investors, is an essential federal exercise of Constitutional
power.  Moore's Adm'r v. Marshall, 196 S.W.2d 369, 372 (Ky.
1946); see also Whelco Indus., Ltd. v. United States, 503

F.Supp.2d 906, 911 (N.D. Ohio 2007) ("Collecting funds for later disbursement and payment of governmental obligations is . . . an exercise of fundamental governmental power.  The ability of the federal government to do so free of state restraint and unfettered by state laws is as essential to its well-being and well-ordered operation as is its ability to pay its debts.").  We hold that application of the State Acts to the unredeemed bond proceeds in the custody of the Bureau would conflict with the comprehensive federal savings bond program, and therefore the State Acts must yield pursuant to the Supremacy Clause.

 **B.  Tenth Amendment**

 The States contend that Treasury's Escheat Decision violates the Tenth Amendment of the Constitution of the United States, which states:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  The States assert that "[b]ecause Congress has not spoken on the subject of unclaimed savings bonds, as it has for other specific types of unclaimed property, defendants may not undertake action on the subject in derogation of state law." (Pl. Br. at 27; see also id. at 31.)

 As discussed above, Congress need not expressly preempt state law; preemption may occur by implication, either because

Congress evinces an intent to preempt the entire field, leaving no room for state regulation, or because the challenged state law would interfere with the execution of federal law.  Moreover, 31 U.S.C. § 3105(b)(2)(A) authorizes the Secretary to "prescribe regulations providing that . . . owners of savings bonds may keep the bonds after maturity or after a period beyond maturity," committing that issue to Treasury's discretion.  Thus, the Court finds no merit to the States' Tenth Amendment argument.  <u>Accord</u> <u>Bowsher I</u>, 734 F.Supp. at 541.

### C.   Notice and Comment Provision of APA

Defendants contend that the States' claim that the Escheat Decision violates the notice and comment rulemaking provision of the APA, 5 U.S.C. § 553, fails to state a claim because the Escheat Decision is an interpretative rule exempt from that provision.  (Def. Br. at 44.)  The provision states:

> (a) This section applies, according to the provisions thereof, except to the extent that there is involved--
>
>> (1) a military or foreign affairs function of the United States; or
>> (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
>
> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served

34

or otherwise have had actual notice thereof in
accordance with law.  The notice shall include–

> (1) a statement of the time, place, and
> nature of public rule making proceedings;
> (2) reference to the legal authority under
> which the rule is proposed; and
> (3) either the terms or substance of the
> proposed rule or a description of the
> subjects and issues involved.

Except when notice or hearing is required by statute,
this subsection does not apply–

> (A) to interpretative rules, general
> statements of policy, or rules of agency
> organization, procedure, or practice; or
> (B) when the agency for good cause finds
> (and incorporates the finding and a
> brief statement of reasons therefor in
> the rules issued) that notice and public
> procedure thereon are impracticable,
> unnecessary, or contrary to the public
> interest.

5 U.S.C. § 553.

Federal savings bonds are contracts between the bondholder
and the United States.  Rotman, 31 Fed. Cl. at 725. Accordingly,
in our view the Escheat Decision explaining Treasury's position
as to the State Acts is exempt from notice and comment rulemaking
procedures under 5 U.S.C. § 553(a)(2) because it concerns
government contracts.  Alternatively, the Escheat Decision would
be exempt from notice and comment requirements under 5 U.S.C. §
553(b)(2)(A) because it is a general policy statement explaining

35

the basis for Treasury's practice of not complying with the State Acts.  (See infra at 41-42.)

## III. Defendants' Arguments Based on Rule 12(b)(1)

### A.   Sovereign Immunity

Under the principle of sovereign immunity, the United States is only subject to suit where it has expressly consented to such suit by statute.  See Lane v. Pena, 518 U.S. 187, 192 (1996). The scope of such waiver is to be strictly construed in favor of the sovereign.  United States v. Williams, 514 U.S. 527, 531 (1995).  A waiver of sovereign immunity is a prerequisite for jurisdiction.  In re Univ. Med. Ctr., 973 F.2d 1065, 1085 (3d Cir. 1992).  States, "like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 280 (1983).  Accordingly, a basis for waiver of sovereign immunity must be pleaded in the complaint.  See Fed.R.Civ.P. 8(a)(1) (requiring a "short and plain statement of the grounds for the court's jurisdiction . . .").

The Fourth Amended Complaint asserts that the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, 1367, 2201, and 2202.  (4th Am. Compl. at ¶ 8.)  General jurisdictional statutes such as 28 U.S.C. §§ 1331 and 1367 do not suffice as a

waiver of sovereign immunity.  See Oriakhi v. United States, No.
08-3716, 2009 WL 1066109, at *2 (D.N.J. Apr. 20, 2009).  "Neither
the Supreme Court nor the Third Circuit has directly spoken to
the issue of whether the Mandamus Act [28 U.S.C. § 1361[11]]
operates as a waiver of sovereign immunity, or whether it simply
provides federal question jurisdiction over petitions for a writ
of mandamus."  Berkery v. Comm'r, No. 09-4944, 2010 WL 99376, at
*4 (E.D. Pa. Jan. 11, 2010) (agreeing with majority of circuit
courts to have addressed the issue and finding that Mandamus Act
does not waive sovereign immunity); cf. Steinbach v. Bureau of
Prisons, 339 F.Supp.2d 628, 630 (D.N.J. 2004) (rejecting argument
that relief under 28 U.S.C. § 1361 is barred by sovereign
immunity), abrogated on other grounds, Bilinsky v. Bureau of
Prisons, No. 04-5379, 2005 WL 1475558, at *2-*3 (D.N.J. Jun. 22,
2005).  The Federal Circuit rejected 28 U.S.C. § 1346, which does
act as a waiver of sovereign immunity, as a basis for
jurisdiction in this action.  McCormac, 185 Fed.Appx. at 955-56.
The declaratory judgment statutes, 28 U.S.C. §§ 2201-2202, do not
grant subject matter jurisdiction to a federal court on a claim
against the United States absent some other waiver of sovereign

---

[11] "The district courts shall have original jurisdiction of any
action in the nature of mandamus to compel an officer or employee
of the United States or any agency thereof to perform a duty owed
to the plaintiff."  28 U.S.C. § 1361.

immunity.  Ragoni v. United States, 424 F.2d 261, 264 (3d Cir.

1970).  Finally, to the extent the States assert a claim under

the Tenth Amendment, the Constitution itself does not waive the

United States' sovereign immunity.  See Jaffee v. United States,

592 F.2d 712, 717-18 (3d Cir. 1979); Wyoming v. United States,

279 F.3d 1214, 1227 (10th Cir. 2002) (holding that Tenth

Amendment claim did not create basis for waiver of sovereign

immunity).

The States contend that no waiver of sovereign immunity is

necessary because the federal government does not assert any

beneficial interest to the unclaimed bonds.  (Pl. Br. at 9-12.)

However, the States argue that if sovereign immunity is

applicable here, the provision for a right of review under the

APA, 5 U.S.C. § 702, would provide the applicable waiver.  (See

4th Am. Compl. at ¶¶ 59-63 (arguing that Treasury's Escheat

Decision constitutes "final agency action" subject to judicial

review under the APA); see also Pl. Br. at 11-23.)

**B.   Whether Waiver is Needed in this Case**

The States contend that "[t]his action does not implicate

sovereign immunity because the United States does not assert a

title or other interest in the Unclaimed Bonds adverse to their

owners."  (Pl. Br. at 8.)  Because Treasury does not assert any

beneficial interest in the unclaimed bond proceeds, the States

argue, "the United States is not really a contesting party, but
is a nominal party only, and its immunity from suit without its
consent is not in issue."  (Id. at 10 (quoting Petition of
Abrams, 512 N.Y.S.2d 962, 967 (N.Y. Sup. Ct. 1986).)

The States' argument that this action does not implicate
sovereign immunity lacks merit on its face.  See Bowsher I, 734
F.Supp. at 534 n.13 (rejecting argument that sovereign immunity
"does not bar actions which seek the disbursement of federal
monies owed to others"); Brockelman v. Brockelman, 478 F.Supp.
141, 142-43 (D. Kan. 1979).  Distinguishing the States' claim for
"custody" of the bond proceeds from cases in which a creditor
sought to assert title to funds held by the federal government
makes no difference with regard to the States' burden of proving
the United States' consent to be sued, because the States'
proposed relief would still require "withdrawal of money from the
public treasury."  Haskins Bros. & Co. v. Morgenthau, 85 F.2d
677, 681 (D.C. Cir. 1936), cert. denied, 299 U.S. 588 (1936)
("The fact that the tax has been collected and deposited in the
treasury by the collecting officials of the government renders
the custodian of the fund impotent to withdraw the money and
disburse it unless and until directed to do so by an act of
Congress or until the United States shall submit to be sued to
determine its disposition.").

Even addressing the merits of the States' contentions in
this regard, however, the Court finds that the interest asserted
by the United States is more than merely "custodial," as
characterized by the States.  See <u>Bowsher II</u>, 935 F.2d at 334
("When the United States sets aside money for the payment of
specific debts, it does not thereby lose its property interest in
that money.").  First, the United States is party to the savings
bond contracts, with which the State Acts would impermissibly
interfere.  Second, the United States has an interest in
preventing potential double liability on the unclaimed savings
bonds, and thus legitimately contests the States' proposal for
taking custody of the unclaimed bond proceeds.  Third, the
States' argument that sovereign immunity is not implicated by the
relief sought in this case ignores the well-established and
strong federal interest in managing the national debt.  Finally,
to the extent the States seek a declaratory judgment invalidating
the Escheat Decision under either the Tenth Amendment or the APA,
the United States is a real party in interest.  Accordingly,
sovereign immunity applies absent a valid waiver.

**C.   Jurisdiction under the APA**

The parties dispute whether the Escheat Decision constitutes
"final agency action" subject to judicial review by this Court
under the APA.  <u>See</u> 5 U.S.C. § 704 ("Agency action made

40

reviewable by statute and final agency action for which there is
no other adequate remedy in a court are subject to judicial
review. . . . "). "Pursuant to 5 U.S.C. § 706, a reviewing court
may "hold unlawful and set aside agency action, findings and
conclusions found to be arbitrary, capricious, an abuse of
discretion or otherwise not in accordance with law.'" Capogrosso
v. 30 River Court, No. 07-5324, 2009 WL 5205274, at *3 (D.N.J.
Dec. 23, 2009).

   "'[A]gency action' includes the whole or a part of an agency
rule, order, license, sanction, relief, or the equivalent or
denial thereof, or failure to act." 5 U.S.C. § 551(13). As a
general matter, two conditions must exist for agency action to be
"final": "First, the action must mark the consummation of the
agency's decisionmaking process . . . it must not be of a merely
tentative or interlocutory nature. And second, the action must
be one by which rights or obligations have been terminated, or
from which legal consequences will flow." Bennett v. Spear, 520
U.S. 154, 177-78 (1997) (internal quotations and citations
omitted).

   Defendants contend that the Escheat Decision "merely
reflects Defendants' historical and current understanding of
applicable law, and in no way rises to the level of final agency
action for which review under the APA is appropriate. Rather,

the language is but a reflection of Defendants' understanding of
the statutes and regulations that has been in place since at
least 1952 and has been uniformly applied since then."  (Def. Br.
at 23; see also Dauenheimer Decl., Ex. 3, at ¶¶ 3-4.)

    The Court agrees that the States' reliance on the Escheat
Decision as "final agency action" conferring jurisdiction under
the APA is misplaced.  Treasury's FAQ on its Internet web site is
a general statement of policy, reflected in the regulations, that
Treasury is willing to transfer bond proceeds to an entity other
than the registered owner only upon proof of transfer of title.
"An agency's decision to publicly share its internal guidelines
and policies does not automatically mean that 'final agency
action' exists."  Ctr. for Food Safety v. Johanns, 451 F.Supp.2d
1165, 1189 (D. Haw. 2006).  Moreover, the "question" part of the
FAQ is a hypothetical question inquiring whether "a state that
has a permanent escheatment law" can "claim the money represented
by securities that the state has in its possession."  (Escheat
Decision.)  "[A]gency letters based on hypothetical facts or
facts submitted to the agency, as opposed to fact-findings made
by the agency, are classically non-final" because responses to
hypothetical questions are necessarily tentative.  Air Brake
Sys., Inc. v. Mineta, 357 F.3d 632, 639 (6th Cir. 2004); see also
Habeeb v. Castloo, 434 F.Supp.2d 899, 909 (D. Mont. 2006)

("Information on agency websites does not constitute final agency action reviewable under the Administrative Procedures Act and does not create legally enforceable entitlements."). Because the FAQ is presented in hypothetical terms, it is legally insignificant that Treasury has stipulated in this case that the Escheat Decision represents Treasury's understanding of existing laws. Air Brake Sys., Inc., 357 F.3d at 646 (rejecting argument that agency was "trying to have it both ways—by simultaneously claiming (1) that the letters represent 'the definitive view of the agency' on their website and (2) that the letters may not be reviewed because they are non-final for APA purposes.").

To the extent the States rely not on the Escheat Decision itself, but rather unspecified "decision[s] to refuse plaintiffs' custody-based escheat laws pursuant to the Escheat Decision" as Treasury's "final agency action" for judicial review purposes under the APA, overcoming the jurisdictional barrier, the States' claims would still fail on the merits for the reasons discussed above. (Pl. Br. at 13 (emphasis added).)

**CONCLUSION**

The Court, for the reasons stated supra, will grant defendants' motion to dismiss.

The Court will issue an appropriate order separately.


                                        s/ Mary L. Cooper
                                    **MARY L. COOPER**
                                    United States District Judge


Dated:    February 5, 2010